**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ESMARK EUROPE, BV, BOUCHARD GROUP, LLC and BOUCHARD GROUP EUROPE, LLC, <br><br>     Plaintiffs, <br><br>     v. <br><br> PETER KAMARÁS, <br><br>     Defendant. | CIVIL ACTION No. |

## COMPLAINT

Plaintiffs Esmark Europe, BV ("Esmark Europe"), Bouchard Group, LLC ("BG") and Bouchard Group Europe, LLC ("BG Europe"), by and through their undersigned counsel, McGuireWoods LLP, file this Complaint and set forth the following in support thereof:

### I.        Introduction

This lawsuit is the result of the failed attempt of Esmark Europe – the investment vehicle of BG Europe, BG, several other investors and Defendant Peter Kamarás ("Kamarás") – to privatize a company, Železara Smederevo d.o.o., from the Republic of Serbia.  Esmark Europe and its investors expended significant time and resources conducting due diligence, formulating a detailed business plan, securing financing and negotiating with Serbian officials and material suppliers over a period of more than ten months.  Esmark Europe and its investors formulated a plan to revitalize Železara Smederevo by utilizing the company's current work force, increasing output, maximizing sales in existing markets, generating sales in new markets and opening the company to new lines of financing.  Throughout this process, the Republic of Serbia's Prime Minister and Finance Minister negotiated with Esmark Europe in good faith and in a professional manner.

Ultimately, in early February 2015, Esmark Europe reached an agreement with the Serbian Government on the key terms of the transaction.  However, to the surprise and dismay of Esmark Europe and its investors, one of its own – Kamarás – was double-dealing.  While a member of the Esmark Europe investment group, Kamarás was privileged to the group's confidential discussions, development of a management strategy, commercial strategy, raw material strategy, operational strategy and financing and funding strategies, all of which formulated a five-year, 400 page business plan for the soon-to-be-privatized Železara Smederevo.  Kamarás was also privy to Esmark Europe's plans to reduce costs and increase efficiencies, both of which were critical to return Železara Smederevo to profitability.  Kamarás, who owns, operates and/or manages one or more business entities that supply and distribute iron ore to Železara Smederevo, learned through his position as an investor, fiduciary and agent of Esmark Europe that the management team and business plan mandated that all raw material contracts for the privatized company would be transparent and market priced, and that the raw materials plan included material that Kamarás did not sell.  Kamarás' above-market-price and/or inferior-quality supply arrangements with Železara Smederevo would thus be impossible if Esmark Europe was successful in its efforts to privatize the Serbian steel company.  Kamarás could not permit this to happen.  He disclosed to a member of the investor group in no uncertain terms: "If [Esmark Europe's deal] goes through and I don't deliver ore I am fucked."

Within weeks of finalizing its bid to privatize the company, Kamarás' true intentions became apparent.  Indeed, Kamarás set out on a course of conduct with the singular goal of sabotaging Esmark Europe, which included defaming members of the investor group, devising and effectuating an alternate plan for the steel company that involved Železara Smederevo remaining government-owned with himself appointed as its general manager or part of its

management team, and making promises to members of the privatization commission charged with negotiating the deal with Esmark Europe on behalf of the Serbian Government.  Kamarás' scheme of self-dealing and treachery worked.  On February 17, 2015, the Republic of Serbia reneged on the sale of Železara Smederevo to Esmark Europe.  As recently reported in the Serbian press, Kamarás' plan is to lead and/or be part of a management team for Železara Smederevo, and their plan will be based upon the key elements of the confidential management strategy and business plan developed by Esmark Europe and its investors.

## II.     Parties

1.     Esmark Europe is a private limited liability company created under the laws of the Netherlands, with a principal place of business in Amsterdam, Netherlands.

2.     BG is an Illinois limited liability company with a principal place of business in Pennsylvania.

3.     BG Europe is the sole shareholder of Esmark Europe.  BG Europe is an Illinois limited liability corporation with a principal place of business in Pennsylvania.

4.     Esmark Europe is the investment vehicle of BG Europe, BG, several other investors and Kamarás to privatize Železara Smederevo d.o.o. from the Republic of Serbia.

5.     Upon information and belief, Kamarás is a citizen of the Slovak Republic and currently resides at Trieda SNP 13, 04011 Kosice Slovakia.  Upon information and belief, Kamarás owns, operates and/or manages one or more business entities involved in the supply and distribution of iron ore materials used in the steel manufacturing process, and at all times relevant to this action was a supplier of iron ore materials to the Železara Smederevo facility as described below.  At all relevant times, unless otherwise described below, Kamarás was an investor, fiduciary and agent of Esmark Europe.

### III.      Jurisdictional and Venue

6.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between Plaintiffs and Defendant.

7.      Venue is proper in this Court because the agreement through which this action arises, and to which this action relates, expressly provides that any proceeding or action brought relating to, or arising out of, the agreement shall be brought in the judicial district of Pittsburgh, Pennsylvania.  Moreover, venue is appropriate in this judicial district because a substantial part of the events giving rise to the claims set forth herein occurred within this judicial district.

### IV.     Factual Background

**A.      The Železara Smederevo Facility**

8.      Železara Smederevo d.o.o. is a company owned by the Republic of Serbia that operates manufacturing facilities which produce steel, hot- and cold-rolled products and tin plate in three locations within the Republic of Serbia (the "Steel Company").

9.      After two failed attempts since 2012, the Republic of Serbia embarked on the process to privatize the Steel Company once again in 2014.

10.      To that end, the Serbian Government formed a Working Group of Government of Serbia for Privatization of Železara Smederevo d.o.o (the "Privatization Working Group") to undertake preliminary discussions and, in December 2014, formed a Privatization Commission to oversee and effectuate the privatization.

11.      At all times relevant to this action, Bojan Bojković was the Executive Director of the Steel Company, served as a member of the Privatization Working Group and as President and member of the Privatization Commission.

**B.**     **A Group of Investors Enter into an Agreement Seeking to Privatize the Steel Company, and Notify the Serbian Government of Their Interest to Privatize the Steel Company**

12.     James Bouchard ("Bouchard") is the Founder, Chairman and Chief Executive Officer of Esmark, Inc., an affiliate of Esmark Europe.

13.     Bouchard is the controlling member of BG Europe and BG.

14.     Bouchard formerly worked as an executive for U.S. Steel in Kosice, Slovakia and was familiar with the Steel Company as a result of U.S. Steel's involvement and ownership prior to 2012.

15.     Bouchard gained valuable experience in revitalizing and running integrated steel mills both while in Slovakia with U.S. Steel and as the Chairman and CEO of Wheeling Pittsburgh Steel and Esmark, Inc.

16.     Given Bouchard's expertise in the integrated-steel-manufacturing business, in early 2014, Kamarás approached Bouchard to gauge his interest in privatizing the soon-to-be privatized Steel Company from the Republic of Serbia.

17.     Upon information and belief, Kamarás had no prior experience owning, operating or managing a steel mill.

18.     However, Kamarás and one or more of his companies supplied and distributed iron ore and other materials used at the Steel Company.

19.     Bouchard knew Kamarás from his days of working for U.S. Steel in Slovakia and considered Kamarás a friend, even hosting Kamarás' daughter for the last year so that she could attend high school in the United States.

20.     In the spring of 2014, at Kamarás' encouraging, Bouchard put together a group of experienced professionals in the steel industry to conduct due diligence and explore the

possibility of privatizing the Steel Company through what Bouchard understood would be a competitive bid process organized by the Republic of Serbia.

21.     Key investors would include individuals with expertise in raw materials other than iron ore, commercial expertise and operational and management expertise, which the Serbian Government would call the "Dream Team."

22.     At all times during these discussions, Bouchard made it clear that BG Europe would have the majority ownership interest and control of any entity that may eventually privatize the Steel Company and that all decision making and operational issues, including but not limited to identifying and sourcing the raw materials to be used in the Steel Company, would reside with the management appointed by Bouchard as the majority owner of Esmark Europe.

23.     At significant expense to BG, BG Europe, Bouchard and other future investors in Esmark Europe, Bouchard led a trip of his proposed management team and investors to Serbia in May and June of 2014 to better understand the Steel Company and the bid process.

24.     Bouchard subsequently met with the Serbian Economic Minister in Washington D.C. in mid-June to further discuss the Republic of Serbia's plan to privatize the Steel Company.

25.     BG Europe, BG, Bouchard and Bouchard's team were interested in moving forward with plans to submit a bid and ultimately privatize the Steel Company.

26.     Later that month, Kamarás, Bouchard and another investor, Uwe Schmidt, met in suburban Pittsburgh to finalize the governance, due diligence strategy and the principal terms of the investor agreement that would eventually lead to the formation of Esmark Europe, which would be the investment vehicle through which the bid would be submitted to privatize the Steel Company.

27.     At these meetings, the investor group also discussed important operational issues of the Steel Company if it were to be privatized by Esmark Europe, including the sourcing of raw materials, one of the most critical issues to running a profitable integrated steel facility.

28.     The result of these meetings was that Kamarás, Bouchard (acting on behalf of BG), and the other investors agreed in principle to form the holding company (i.e., Esmark Europe), for the purpose of privatizing the Steel Company.

29.     Pursuant to that agreement, Kamarás would be rewarded with an equity position in Esmark Europe without having to pay full value for his shares.

30.     In consideration for awarding him equity in Esmark Europe without a capital contribution, Kamarás was to advise Esmark Europe and its investors regarding iron ore and other raw materials during the first phase of the project and liaise with individuals in Serbia as requested by Esmark Europe and its investors during the first due diligence trip.

31.     Pursuant to the parties' agreement, BG would initially hold 55% of the equity of Esmark Europe, Kamarás would hold a 12.5% equity stake in Esmark Europe and the remaining investors would collectively own 32.5% of Esmark Europe.

32.     The investors structured Esmark Europe in such a manner that they would make money once the Steel Company became profitable, via their equity ownership in the company – and not through self-dealing with the Steel Company.

33.     Shortly after the Esmark Europe investor group was formed, and despite his minority position in the group, Kamarás attempted to commandeer the group's efforts to formulate its bid for the Steel Company.

34.     Specifically, on July 2, 2014, Kamarás demanded that he lead all communications with the Serbian Government and the existing management of the Steel Company, a request that seemed odd given his lack of experience operating or managing a steel manufacturing facility.

35.     However, it was made clear to Kamarás that, consistent with the agreement of the parties, Bouchard and/or another representative of BG would control and lead the due diligence efforts and all other communications with the Serbian Government regarding the potential privatization of the Steel Company.

36.     Despite shaking hands and celebrating their venture in Pittsburgh a week earlier, Kamarás strategically omitted Bouchard and BG from several communications with other investors in which Kamarás repeatedly demanded that the parties formalize their agreement in writing out of paranoia that BG could not be trusted.

37.     At the same time, Kamarás communicated to Bouchard the need for a written agreement among the investors for a completely different reason.

38.     According to Kamarás, he was approached by certain members of the Serbian Government involved in the privatization process who expressed a position that they were favoring a competing Russian investor group over Esmark Europe's efforts.

39.     Kamarás made it clear to Bouchard that Kamarás could persuade the Serbian Government officials to transfer their support from the Russian investor group to Esmark Europe if Kamarás' equity position in Esmark Europe was reduced to writing and agreed to by all investors in Esmark Europe.

40.     Indeed, Kamarás stated that he would go forward with this venture only if there was a written agreement defining the investors' roles and responsibilities.

41.     Having grown impatient that the parties had not memorialized their agreement in writing, Kamarás had his lawyer draft a term sheet and send it to the parties on July 11, 2014.

42.     This draft term sheet laid out Kamarás' plans to control the purchasing of iron ore and other raw materials by requiring that no binding bid be made for the Steel Company unless the parties entered into an <u>exclusive supply agreement</u> with Kamarás on terms satisfactory to Kamarás.

43.     In addition, the draft term sheet ensured Kamarás' control by making him a permanent member of the board of directors and as the vice-chairman of the board.

44.     Such terms were completely inconsistent with the prior terms discussed in Pittsburgh and were unacceptable to BG and the other investors.

45.     Schmidt approached Bouchard and Kamarás to see if he could mediate the situation.

46.     Bouchard advised that Kamarás' behavior to date was not only unacceptable and worrisome, but also created an appearance of self-dealing which would not be tolerated.

47.     On behalf of BG, Bouchard made clear that he would move forward only if Kamarás and the other investors agreed that they would: (1) not interfere with the negotiations or management of the Steel Company; (2) not compete with the venture's interests in privatizing the Steel Company; (3) maintain confidentiality; and (4) comply with the anti-bribery laws of the United States and other jurisdictions.

48.     Once again, Bouchard unequivocally explained the framework of this venture:

(a)     Any raw material contracts with investors and the Steel Company would have to be transparent and include market-based pricing;

9

(b)     Esmark Europe's appointee for the Steel Company's Chief Operating Officer would make the decision on quality and pricing, and from where and whom to buy; and

(c)     Kamarás would have the option to arrange such purchases if he could match the quality, quantity and price on a <u>non-exclusive</u> basis.

49.     The investors, including Kamarás, agreed to these terms.

50.     Importantly, Kamarás backed down from his prior position to control all communications and told Bouchard that BG was "running the entire show."

51.     BG instructed its lawyers to draft a confidential term sheet memorializing the key terms set forth above (the "Term Sheet") and circulate it to the investors.

52.     After minor revisions were circulated among the parties, Kamarás sent an email on July 16, 2014 to Bouchard and the other investors, agreeing to the terms set forth in the Term Sheet and admitting that he "could not write [the Term Sheet] better" himself.

53.     Kamarás specifically agreed to serve as a <u>non-exclusive</u> agent of Esmark Europe for the supply of iron ore.

54.     Kamarás' initial capital contribution for his 12.5% equity share was met by the 40,000 Euros in expenses he reportedly incurred in June 2014 during the first due diligence trip and as a finder's fee for bringing the deal to the investor group.

55.     On August 1, 2014, less than a month after the parties entered into the Term Sheet, Bouchard (on behalf of Esmark, Inc., BG and Esmark Europe) submitted to the Serbian Government a written, non-binding expression of interest to privatize the Steel Company.

56.     By creating, reviewing and submitting this non-binding expression of interest, Kamarás and the other investors affirmed their commitment to Esmark Europe, the terms set forth in the Term Sheet, and their efforts to privatize the Steel Company.

57.     On October 7, 2014, Bouchard (on behalf of Esmark, Inc., BG and Esmark Europe) submitted to the Serbian Government a written, formal expression of interest to privatize the Steel Company.

58.     Once again, Esmark Europe's investors affirmed their commitment to Esmark Europe, the terms set forth in the Term Sheet, and their efforts to privatize the Steel Company when they created, reviewed, and submitted this formal expression of interest.

59.     In November 2014, the Term Sheet was amended and restated[1] to reduce Kamarás' share, at his request, so another investor could increase their holding in the venture.

60.     In pertinent part, Term Sheet's provisions remained unchanged regarding: (1) no interference with the negotiations or management of the Steel Company; (2) no competition with the venture's interests in privatizing the Steel Company; (3) maintaining confidentiality; and (4) complying with the anti-bribery laws of the United States and other jurisdictions.

61.     Again, Kamarás affirmed his role as a <u>non-exclusive</u> agent of Esmark Europe for the supply of iron ore.

62.     Of particular importance to Bouchard and BG were the provisions of the Term Sheet requiring confidentiality and compliance with the laws of the United States and other jurisdictions, including the anti-bribery and kick-back laws, given their increasing suspicions of Kamarás' loyalty to the Esmark Europe investment group.

**C.     Kamarás Overtly Supports Esmark Europe While He Covertly Formalizes a "Plan B" to Undermine Esmark Europe's Efforts to Privatize the Steel Company**

63.     With their internal affairs in order and memorialized first in a Term Sheet, then in an amended and restated Term Sheet, Esmark Europe focused on the task at hand – putting together a plan to restructure the Steel Company and a bid to privatize it.

---

[1] Collectively, the Term Sheet and the amended and restated term sheet will be referred to as the "Term Sheet."

64.     To that end, over the course of the next several months, Esmark Europe representatives conducted due diligence and held discussions with the Republic of Serbia regarding terms of a potential privatization, as well as initiated discussions with financial institutions regarding possible working capital lines of credit for the Steel Company.

65.     BG and the future Esmark Europe management team expended considerable time and resources compiling a detailed business plan for the Steel Company, which included a sales strategy, projected prices for key final products, a projected production plan, a projected procurement strategy, projected operating cost optimization, a projected financing plan (including suppliers and banks), projected employment levels and an expected financial development for the Steel Company through projected income statements, balance sheets and cash flow statements.

66.     Kamarás had no involvement in compiling the thorough and complicated business plan that exceeded 400 pages at length.

67.     The business plan provided a user-friendly operations manual for revitalizing and operating the Steel Company, and was prepared subject to the confidentiality provisions of the Term Sheet agreed upon by the investors, including Kamarás.

68.     Similarly, in October 2014, the management team of Esmark Europe laid out its raw material plan to the investors, including Kamarás, which detailed the burden model (i.e., the "secret sauce") for the Steel Company's success, including materials to reduce the iron cost.

69.     Kamarás had an opportunity to review the material plan and responded that it was "a very good and ambitious plan" and that "I will try to support you as much as I can."

70.     However, as BG and the other investors of Esmark Europe would later discover, Kamarás, through a series of actions and omissions intended to undermine Esmark Europe's bid

to privatize the Steel Company, misappropriated the confidential information contained in the confidential business plan and the raw material plan for his personal financial gain, when he learned that his over-priced iron ore supply arrangements with the Steel Company were in jeopardy if Esmark Europe was the successful bidder.

71.    As Kamarás learned exclusively through his affiliation with Esmark Europe, and by reviewing its confidential business plan, it would be necessary to purchase iron ore and other raw materials at market prices based on the quality and quantity of iron in order to make the Steel Company profitable.

72.    Esmark Europe's confidential business plan also called for the Steel Company to purchase other ores and iron materials not previously supplied to the Steel Company.

73.    To do so, the Steel Company would need to: (1) purchase a certain quality and/or quantity of iron ore and/or pellets that was not likely capable of being supplied by Kamarás' Ukrainian ore suppliers and (2) discontinue Kamarás' practice of charging exorbitant prices for, or providing, below-quality iron ore and other materials – a practice that was continuing throughout 2014, and one which Kamarás bragged about to others.

74.    Another key issue for Esmark Europe was to secure an alternate supply of iron ore as a contingency, especially because Kamarás' primary supply of ore was from the Ukraine, which was embroiled in a territorial crisis and border war with the Russians.

75.    While Esmark Europe prepared its bid and acted in accordance with the Term Sheet, unbeknownst to BG and Bouchard, Kamarás covertly sought dissent among the other minority investors.

76.    For example, despite Kamarás agreement that purchases of raw materials would be under the control of management designated by Esmark Europe, he wrote to investor Schmidt

that if Esmark Europe were to privatize the Steel Company, its future raw material purchases *should* be solely under his and Schmidt's control, foreshadowing the series of events which would ultimately undermine Esmark Europe's efforts to privatize the Steel Company.

77.     Once Kamarás learned that Esmark Europe was compiling a chart of quality and pricing of ores and other materials to present to financial institutions for the proposed financing, taking into account the new burden plan – the "secret sauce" – then Kamarás saw that his undisclosed plan to control the raw material pricing and profit from sales to the Steel Company was slipping away.

78.     Upon information and belief, Kamarás' iron ore companies could not meet the quality or competitive pricing envisioned by Esmark Europe and, therefore, Kamarás threatened to withdraw his participation in Esmark Europe as it was preparing to submit its bid to the Republic of Serbia.

79.     Moreover, Kamarás' iron ore companies had not previously supplied the other ores and iron materials called for in Esmark Europe's confidential burden plan – and even if Kamarás could supply these new materials at market prices, his profit margins would disintegrate if he tried.

80.     Indeed, on December 12 and 13, 2014, Kamarás advised Bouchard that he was "no longer part of the Esmark Europe's effort to privatize Železara Smederevo," just as Esmark Europe was preparing the privatization bid.

81.     Kamarás also wrote to the Esmark Europe management team in an attempt to discredit those involved in the raw material evaluation:  "I am not telling you I am saint, I do not want to insult your intelligence" but there are a "million ways how to cheat, trust me I know/used them all."

82.     Kamarás then wrote a larger group of investors, explaining that if he did not control the purchasing of raw materials, then other purchasers would steal the money.

83.     Kamarás did not mince words: "I do not work my ass off and spent so much money to give this factory under control of corrupted Serbian/Russian or Ukrainian managers and suppliers."

84.     In this communication, Kamarás' selfish and disloyal motives were clear, stating: "If I was the one with total control [of the Steel Company] I could, theoretically, take 10 million USD per year without any problem and without anybody noticing.  I would leave the mill after a year smiling and rich."

85.     Similarly, it became clear that Kamarás was acting for his own self-interest to preserve his profit from iron ore raw material supplies, not that of his principal in the transaction, Esmark Europe, of which he contracted for an equity interest.

86.     Indeed, upon information and belief, Kamarás bragged on several occasions that his companies routinely overcharged the Steel Company for raw material and delivered a substandard quality of raw material.

87.     At one point, Kamarás emphatically explained to investor Schmidt that it was imperative that Kamarás retain control over the raw material purchases at the Steel Company, telling Schmidt: "If [the Esmark Europe deal] goes through and I don't deliver ore I am fucked."

88.     Upon information and belief, Kamarás and/or his partners or family members had recently committed to purchase or take a financial interest in a Ukrainian iron ore mine, and the profitability and viability of Kamarás' mine was dependent on Kamarás steering the Steel Company's iron ore purchases to that mine.

89.     Kamarás knew that his companies had been supplying substandard iron ore and other materials at above-market prices, and such pricing practices and tricks regarding quality and content were not part of Esmark Europe's plan to revitalize the Steel Company.

90.     As it became clear to Kamarás that Esmark Europe would not permit the Steel Company, if privatized, to continue paying exorbitant prices for iron ore and it would ensure the quality of the materials, Kamarás explained to one investor: "I can't wait until the end of the bidding I have to make decisions in next couple of days."

91.     Despite his status as an investor, advisor and agent of Esmark Europe, Kamarás could not allow Esmark Europe to prevail in its bid, and devised a scheme to undermine Esmark Europe's bid to privatize the Steel Company.

92.     Kamarás referred to this scheme as his "Plan B," which involved leveraging knowledge of Esmark Europe's confidential information gained in his position of trust within the Esmark Europe investment group, including its business plan and other information discussed in connection with the Term Sheet, to usurp Esmark Europe's corporate opportunity to privatize the Steel Company and have himself made a part of the Steel Company's management, or even appointed as general manager of the Steel Company.

93.     If his Plan B failed, then Kamarás was ready to pursue alternate courses of action to defeat Esmark Europe.

94.     Notably, while still a member of the Esmark Europe's investor group, Kamarás bragged that he also had a Plan C, D and E, one of which he described as aligning himself with other ore manufacturers to take over the Steel Company because they could make more profit that way.

95.     As the deadline for Esmark Europe to submit its bid to the Privatization Commission neared, Kamarás' true intentions were becoming clearer to the Esmark Europe investment group: Kamarás threatened to withdraw from Esmark Europe to enact one of his alternate plans.

96.     Concerned by Kamarás' comments and their resulting suspicion of his double-dealing, the investors invited Kamarás to participate in a meeting that all of the investors and senior management of Esmark Europe attended.

97.     The meeting was held on December 22, 2014 and was intended to allow the parties to air any differences, discuss a path forward for the venture, and address potential operational issues if Esmark Europe was to be a successful bidder, including but not limited to the role Kamarás' companies would play as a supplier of iron ore and other materials to the Steel Company.

98.     At this meeting, the "game rules" were discussed, including Kamarás role as a supplier for iron ore and other material, specifically that any supplier of raw materials, including any company in which Kamarás holds an interest, had to be transparent and market priced and that agency arrangements had to be transparent and market priced.

99.     The "game rules" again included that Esmark Europe's appointed Steel Company Chief Operating Officer alone would make purchasing decisions based upon quality and price.

100.    Indeed, each investor was expressly asked if they agreed to the "game rules."

101.    Kamarás agreed to these rules – which were the same terms as discussed in June and July and previously agreed to by Kamarás.

102.    Shortly after this meeting, the investors revised the Term Sheet and each of the investors, including Kamarás, made an additional capital contribution to Esmark Europe as it was preparing to submit its formal bid to the Republic of Serbia to privatize the Steel Company.

103.    Esmark Europe and its investors mistakenly believed Kamarás was on board and that his previous rumblings about his need to control the sourcing of iron ore were a thing of the past.

**D.    Kamarás Acts as a Double Agent by Working For, and Against, Esmark Europe's Privatization of the Steel Company and Thereafter Employs His "Plan B"**

104.    On January 3, 2015, while still a member of the Esmark Europe investment group, Kamarás met with Esmark Europe's proposed Chief Operating Officer for the Steel Company in Washington, D.C. to discuss issues related to the procurement of raw materials.

105.    During the meeting, Kamarás confirmed that he was very much still part of the Esmark Europe team – the "Dream Team," as he said the Serbian Government referred to it.

106.    Despite such representations and his agreement to the Term Sheet, Kamarás was in fact double-dealing by recruiting new players for his "Plan B."

107.    All the while appearing to support Esmark Europe's bid, Kamarás was recruiting individuals who he thought were capable of managing the Steel Company and other raw material suppliers because he had neither the expertise nor the requisite connections.

108.    He was also taking steps to recruit and convince members of the Privatization Commission to vote against Esmark Europe's bid.

109.    If Kamarás could quietly kill Esmark Europe's prospect of privatizing the Steel Company, then his above-market supply contracts would remain in effect and the path would be clear for him to implement his Plan B.

110.    Upon information and belief, Kamarás flew to Belgrade, Serbia directly from his meeting with Esmark Europe's Chief Operating Officer in Washington, D.C., with Esmark Europe's business plan in hand, to meet with members of the Privatization Commission and members of the Serbian Government to discuss his Plan B.

111.    Upon information and belief, Kamarás' Plan B involved the Republic of Serbia retaining the Steel Company and appointing an alternate management group consisting of a general manager for the Steel Company and a team of individuals to procure raw materials and sell steel.

112.    Upon information and belief, Kamarás reasoned that if the Republic of Serbia retained the Steel Company and employed his Plan B, then Kamarás would have the opportunity to continue supplying the Steel Company with overpriced, substandard ores until the money ran out and then Kamarás would leave "smiling and rich."

113.    Upon information and belief, Kamarás met with the President of the Privatization Commission and the Executive Director of the Steel Company, Bojan Bojkovic, to discuss and implement Kamarás' strategy to undermine Esmark Europe's privatization of the Steel Company.

114.    Upon information and belief, Kamarás made promises of employment and other consideration to Bojkovic if the Esmark Europe bid was rejected and Kamarás' Plan B was implemented.

115.    Upon information and belief, Kamarás and Bojkovic engaged in a scheme to direct services and iron ore supplies to Kamarás and his friends in the event Plan B did not work, to optimize their profiteering while they had the opportunity, which included the following acts:

a.      Upon information and belief, Bojkovic hurriedly had the Steel Company enter into a contract with a Slovakian engineering company and "prepaid" for services days later from the Steel Company's scarce funds, despite Esmark Europe's objection to such a contract just a month earlier.

b.      Upon information and belief, Bojkovic also canceled existing raw material orders placed in the month of January with one iron ore trader, and quickly replaced those orders with orders from entities controlled by Kamarás, so that Kamarás could further benefit.

c.      Upon information and belief, Kamarás and Bojkovic additionally sent messages to other raw material suppliers that only Kamarás would supply iron ore to the Steel Company and that they should not get involved.

116.    On January 5, 2015, Esmark Europe timely submitted its bid to privatize the Steel Company.

117.    On January 12, 2015, Esmark Europe's bid was selected because Esmark Europe was the only qualifying and credible bidder during the tender process.

118.    Thereafter, Esmark Europe began negotiating the final terms and conditions of its privatization of the Steel Company with the Privatization Commission.

119.    During the second week of January, Kamarás' double-dealing and treachery began to come to light more publicly as Kamarás frequently became confused as to whose side he was on during Esmark Europe's negotiations with the Privatization Commission.

120.    In communications with Esmark Europe, Kamarás would use the pronoun "we" when referring to the Privatization Commission, and "they" when referring to Esmark Europe.

121.    The most telling sign of Kamarás' double-dealing occurred during the in-person negotiations with the Privatization Commission.

122. Although Kamarás was not in the room during any of the negotiations, Kamarás texted another member of Esmark Europe's investment group in real time: "[Esmark Europe lawyer] just said that *they* [Esmark Europe] have two suppliers of raw material who are ready to finance. . . ." (emphasis added).

123. Other text messages followed which clearly demonstrated that Kamarás was not acting to further Esmark Europe's interests.

124. No one from the Esmark Europe team in the meeting sent a text message to Kamarás during the meeting.

125. Therefore, Kamarás could only have received the information from a member of the Privatization Commission in attendance at the meeting.

126. Upon information and belief, Kamarás was communicating with Bojkovic, with whom he had made arrangements to accommodate under his Plan B, and possibly another Privatization Commission representative, in an effort to spread falsehoods and undermine Esmark Europe's efforts to privatize the Steel Company.

127. In very simple terms, during the bid process and subsequent negotiations, Kamarás held himself out as part of the Esmark Europe team, to whom he owed contractual and fiduciary duties, while at the same time secretly aligning himself with members of the Privatization Commission to secure the rejection of Esmark Europe's bid in favor of his Plan B.

128. Upon information and belief, Kamarás' actions were part of his plan to discredit Esmark Europe and advance his Plan B.

129. During negotiations with the Privatization Commission, it was obvious to the Esmark Europe team that members of the Privatization Commission had received false and misleading information about Esmark Europe and its plan for the Steel Company.

130.    Upon reviewing the "we" and "they" text messages with members of the Esmark Europe team after the negotiations, it became clear that Kamarás was acting as a double-agent.

131.    Bouchard sent an e-mail to all of the investors asking if they had had any communications with government representatives during the bid process and subsequent negotiations.

132.    Every investor but Kamarás emphatically responded "no."

133.    Kamarás, however, did not respond.

134.    Bouchard and BG would later learn the truth about Kamarás and his false and misleading statements.

135.    Upon information and belief, Kamarás discredited BG Europe and BG's principal, Bouchard, to Esmark Europe's investors, and, upon information and belief, to members of the Privatization Commission and officials of the Serbian Government for the purpose of derailing Esmark Europe's privatization of the Steel Company.

136.    As Kamarás stated in one false and defamatory text message to a member of Esmark Europe's investment group: "[Bouchard] is lying . . . [t]o you, me, everybody and probably also to himself."

137.    Kamarás also publicly defamed BG Europe and BG by stating that its principal "is twisting everything so he can explain . . . his total failure negotiating" the privatization of the Steel Company.

138.    Kamarás also publicly accused Esmark Europe representatives of self-dealing, incompetence and deceit.

139.    Kamarás knew each and every one of these statements was false and known to be false.

140.    Moreover, Kamarás accused Esmark Europe representatives of threatening hostile action against Serbian Government officials.

141.    Upon information and belief, no Esmark Europe representative ever made a threat against an official of the Serbian Government.

142.    Upon information and belief, Kamarás spoke negatively about Esmark Europe representatives to discredit and undermine Esmark Europe's bid to privatize the Steel Company.

143.    Kamarás constantly jockeyed for position with the Serbian Government and the Privatization Commission while attempting to manipulate shareholders, managers and key service providers of Esmark Europe.

144.    Finally, in late January 2015, Esmark Europe and its investors had enough of Kamarás and unanimously wanted to sever ties with him.

145.     After learning that Kamarás purposefully and systematically sabotaged Esmark Europe's privatization of the Steel Company, Bouchard (on behalf of BG and Esmark Europe) accepted Kamarás' offer to withdraw from Esmark Europe's efforts to privatize the Steel Company and terminated Kamarás' participation in Esmark Europe pursuant to the Term Sheet on January 24, 2015.

146.    Thereafter, Esmark Europe continued its negotiations with the Privatization Commission.

147.    Upon information and belief, Bojkovic, acting at Kamarás' direction, commanded the Steel Company management team refrain from speaking with Esmark Europe representatives to further frustrate Esmark Europe's privatization efforts.

148.    Upon information and belief, Kamarás then falsely represented to the Privatization Commission that Esmark Europe did not have the experience or capability to

purchase raw materials if Kamarás was no longer affiliated with Esmark Europe, a statement that ignores the fact that Esmark Europe's investment group has over thirty years of experience purchasing raw materials for steel mills.

149.    Nevertheless, the Privatization Commission and the media cited this as one of the reasons why the Privatization Commission did not complete the deal with Esmark Europe.

150.    Not coincidentally, once Kamarás was no longer affiliated with Esmark Europe, the Privatization Commission, led by Bojkovic, insisted that Esmark Europe agree to new terms that were not included in Esmark Europe's bid and which had previously been resolved, dramatically changing the parties' deal.

151.    In one late-night negotiation session, the Privatization Commission members were overhead saying that "Peter said . . .," clearly demonstrating that Kamarás had recent communications with the Privatization Commission.

152.    Despite Kamarás' efforts to undermine the negotiations and prevent Esmark Europe from privatizing the Steel Company, Esmark Europe had a successful final round of negotiations with members of the Serbian Government in Pittsburgh on February 12 and 13, 2015, and reached an agreement on the material terms of Esmark Europe's privatization of the Steel Company.

153.    In fact, Serbian Prime Minister Vučić and Finance Minister Vujovic confirmed in a press release that a formal announcement of the deal was imminent.

154.    Esmark Europe projected that the privatized Steel Company, under Esmark Europe's management, would generate a profit in excess of one hundred million dollars ($100,000,000.00) in its first five years of operation.

155.    Upon information and belief, while members of the Serbian Government were in Pittsburgh, Kamarás met with the Privatization Commission to negotiate the terms of a management services agreement for the Steel Company that would undermine Esmark Europe's efforts to privatize the Steel Company.

156.    Suddenly and unexpectedly, at the final hour, the Privatization Commission reneged upon the terms and conditions upon which it had previously agreed with Esmark Europe.

157.    Instead, the Privatization Commission, led by its president Bojkovic, insisted that Esmark Europe agree to terms that only an insider – like Kamarás – knew would derail the finalization of the deal.

158.    Upon information and belief, Kamarás knew which terms would cause an impasse between Esmark Europe and the Privatization Commission from the knowledge he gained during his previous affiliation with Esmark Europe and provided these terms to Bojkovic for the sole purpose of preventing Esmark Europe from privatizing the Steel Company.

159.    With uncanny timing, the Prime Minister announced on February 14, 2015 that, in the event Esmark Europe did not privatize the Steel Company, a management team would be appointed for the Steel Company, which would include individuals experienced in procuring raw materials and selling steel – the very "Plan B" that Kamarás proposed and bragged about only weeks before.

160.    Within days of this announcement, the Privatization Commission terminated all efforts to privatize the Steel Company, and the Serbian Government announced that it was moving forward with its Plan B – a process requesting interested companies to submit a fulsome

business plan no later than March 6, 2015, for the opportunity to enter into a management services agreement with the Serbian Government to run the Steel Company.

161.    To date, press reports in Serbia have expressly identified Kamarás as the leader of a group to become the next management of the Steel Company.

162.    Upon information and belief, Kamarás is utilizing Esmark Europe's business plan to meet the requirements of the management services agreement process.

163.    As a direct result of Kamarás' deceitful and self-dealing actions, Esmark Europe is unable to privatize the Steel Company and lost the opportunity to generate more than one hundred million dollars ($100,000,000.00) in profits associated with that venture over the next five years.

**COUNT I**
**Breach of Contract:  Breach of the Confidentiality Provision**
**(BG v. Kamarás)**

164.    BG hereby incorporates by reference the allegations set forth in paragraph 1 through 163, above, as though fully set forth herein.

165.    On July 16, 2014, Kamarás entered into, and agreed to be bound by, the Term Sheet.

166.    Later, Kamarás entered into, and agreed to be bound by, the revisions to the Term Sheet.

167.    The Term Sheet includes a confidentiality provision that requires Kamarás to maintain the confidentiality of any confidential information disclosed to him during BG's, the Esmark Europe investment group's and Esmark Europe's attempt to privatize the Steel Company.

168.    The Term Sheet subjects Kamarás to a continuing obligation requiring Kamarás to maintain the confidentiality of any confidential information disclosed to him by BG or the Esmark Europe investment group.

169.    Furthermore, Kamarás' role as an investor in Esmark Europe and advisor to BG and the Esmark Europe investment group imposed a duty of good faith and fair dealing upon Kamarás.

170.    BG and the Esmark Europe investment group provided Kamarás with confidential information related to the privatization of the Steel Company.

171.    Despite his duty of good faith and fair dealing and his obligation to keep this information confidential, Kamarás disclosed confidential information to members of, and advisors to, the Administration, the Privatization Working Group, the Privatization Commission and the Steel Company.

172.    Upon information and belief, Kamarás continues to disclose BG's and the Esmark Europe investment group's confidential information to others to advance his plan to operate the Steel Company.

173.    Accordingly, Kamarás breached his duty of good faith and fair dealing, and the confidentiality obligation of the Term Sheet.

174.    Kamarás' breaches of the Term Sheet's confidentiality provision, and his duty of good faith and fair dealing, prevented Esmark Europe, the Esmark Europe investment group and BG from privatizing the Steel Company.

175.    As a direct result of Kamarás' breaches, BG has suffered monetary damages in excess of this Court's jurisdictional threshold.

<u>COUNT II</u>
**Breach of Contract:  Breach of Provision Requiring Compliance with All Applicable Laws
(BG v. Kamarás)**

176.    BG hereby incorporates by reference the allegations set forth in paragraph 1 through 175, above, as though fully set forth herein.

177.    The Term Sheet included a provision that obligated Kamarás to comply with all applicable laws, including the U.S. Foreign Corrupt Practices Act and all applicable anti-bribery and anti-kickback laws.

178.    Kamarás admitted to spending "several hundred thousands" of dollars in connection with the privatization of the Steel Company.

179.    Upon information and belief, Kamarás did not spend that money or disclose to Esmark Europe that he spent such money, in connection with Esmark Europe's privatization efforts.

180.    Upon information and belief, Kamarás made payments to individuals who may have directly or indirectly influenced the decision to terminate the privatization process with Esmark Europe.

181.    To the extent Kamarás made these financial payments, it is averred that the payments were illegal, improper and constitute a breach of the Term Sheet.

182.    Upon information and belief, Kamarás promised to employ Bojan Bojković, the Executive Director of the Steel Company, as a member of the Privatization Working Group and as President and member of the Privatization Commission.

183.    To the extent Kamarás made any promises for employment, the promises were illegal, improper and constitute a breach of the Term Sheet.

184.    Upon information and belief, Kamarás' breaches of the Term Sheet's requirement that Kamarás comply with all applicable laws, including the U.S. Foreign Corrupt Practices Act and all applicable anti-bribery and anti-kickback laws, prevented Esmark Europe and, in turn, the Esmark Europe investment group from privatizing the Steel Company.

185.    As a direct result of Kamarás' breaches, BG – as a member of the Esmark Europe investment group – has suffered monetary damages in excess of this Court's jurisdictional threshold.

**COUNT III**
**Breach of Fiduciary Duty**
**(Esmark Europe v. Kamarás)**

186.    Esmark Europe hereby incorporates by reference the allegations set forth in paragraph 1 through 185, above, as though fully set forth herein.

187.    Under Pennsylvania law, an agent owes his or her principal fiduciary duties of due care, loyalty and good faith in all matters connected with the agency relationship.

188.    An agent's duties of loyalty include a duty to refrain from competing with the principal and from taking action on behalf of, or otherwise assisting, the principal's competitors throughout the duration of the agency relationship, as well as a duty not to use property or confidential information of the principal for the agent's own purpose or those of a third party.

189.    Kamarás, agreed to invest in Esmark Europe and serve as an advisor to Esmark Europe and its investors regarding iron ore and other raw materials during the first phase of the project and liaise with individuals in Serbia as requested by Esmark Europe and its investors during the first due diligence trip.

190.    By virtue of his agency relationship with Esmark Europe, Kamarás owed the fiduciary duties of loyalty, care and good faith to Esmark Europe.

191.    Kamarás was obligated to act in a manner reasonably believed to be in the best interest of Esmark Europe, utilizing the skill, care and diligence that a person of ordinary prudence would exercise under such circumstances.

192.    Upon information and belief, Kamarás disseminated Esmark Europe's confidential business plan, including the raw material procurement plans, negotiation strategy, management strategy, commercial strategy and operational strategy, to the Administration, the Privatization Working Group, the Privatization Commission and the Steel Company.

193.    Upon information and belief, Kamarás systematically and repeatedly utilized Esmark Europe's confidential information, including its business plan, and his status as an investor in Esmark Europe for his personal financial advantage, to obtain the requisite third-party financing, and to the disadvantage of Esmark Europe.

194.    Kamarás conduct actively undermined Esmark Europe's attempt to privatize the Steel Company by providing false information to the Administration, the Privatization Working Group, the Privatization Commission and the Steel Company that suggested Esmark Europe was ill-equipped to operate the Steel Company and could not finance its privatization of the Steel Company.

195.    Upon information and belief, Kamarás improperly usurped a business opportunity from Esmark Europe when he exploited his knowledge of Esmark Europe's confidential information and business plan to place himself in a position to manage the Steel Company as a going concern, despite his fiduciary obligations prohibiting such conduct.

196.    Kamarás' actions were taken for his personal benefit and to the detriment of Esmark Europe and, in turn, the other Esmark Europe investors.

197.    Kamarás' actions constitute self-dealing, a lack of good faith, a lack of loyalty, a lack of due care, a conflict of interest and a disregard for his fiduciary duties to Esmark Europe.

198.    As a direct and proximate result of Kamarás' actions, Kamarás' caused significant losses to Esmark Europe in excess of this Court's jurisdictional threshold.

199.    Kamarás' actions were willful, wanton, malicious and intentional and caused significant harm to Esmark Europe and warrant the imposition of punitive damages against Kamarás.

### COUNT IV
**Breach of Duty of Loyalty as Agent of Esmark Europe**
**(Esmark Europe v. Kamarás)**

200.    Esmark Europe hereby incorporates by reference the allegations set forth in paragraph 1 through 199, above, as though fully set forth herein.

201.    Pennsylvania common law recognizes a duty of loyalty owed by an agent to his principal in all matters affecting the subject of his agency, which includes acting with the utmost good faith in furthering and advancing the principal's interests.

202.    Furthermore, Pennsylvania law specifically prohibits an agent from using confidential information related to the principal's business and acquired therein for the agent's own personal financial gain or usurping a business opportunity from the principal.

203.    Kamarás agreed to serve, and served, as an agent of Esmark Europe.

204.    During the course of Kamarás' agency relationship with Esmark Europe, Kamarás had access to and obtained Esmark Europe's confidential information, which included, *inter alia*, Esmark Europe's business plan, raw material procurement plans and negotiation strategy.

205.    Kamarás' access and use of Esmark Europe's confidential information created a duty of loyalty that Kamarás owed to Esmark Europe, which included a duty to refrain from

using Esmark Europe's confidential information for Kamarás' own purpose or the purpose of any third party.

206.    Upon information and belief, Kamarás utilized Esmark Europe's confidential information to become a part of the lead management team that will operate the Steel Company.

207.    Upon information and belief, Kamarás improperly usurped a business opportunity from Esmark Europe when he exploited his knowledge of Esmark Europe's confidential information and business plan to place himself in a position to manage the Steel Company as a going concern, despite his duty of loyalty prohibiting such conduct.

208.    Kamarás' conduct as described above violated his duty of loyalty owed to Esmark Europe.

209.    Kamarás' violation of his duty of loyalty has caused Esmark Europe to suffer monetary damages in excess of this Court's jurisdictional threshold.

210.    Kamarás' actions were willful, wanton, malicious and intentional and caused significant harm to Esmark Europe and warrant the imposition of punitive damages against Kamarás.

### COUNT V
### Unfair Competition
### (Esmark Europe, BG Europe and BG v. Kamarás)

211.    Esmark Europe, BG Europe and BG hereby incorporate by reference the allegations set forth in paragraph 1 through 210, above, as though fully set forth herein.

212.    Pennsylvania law recognizes a common law claim for unfair competition, which prohibits, *inter alia*, misrepresentation, tortious interference with contract and unlawful use of confidential information.

213.    By engaging in the above-described conduct, which includes exploiting his knowledge of the confidential business plan and raw material to compete with Esmark Europe and making disparaging comments about Esmark Europe and its investors, Kamarás willfully, unlawfully and without privilege, engaged in unfair competition with Esmark Europe, BG Europe and BG, to Esmark Europe's, BG Europe's and BG's detriment.

214.    As a result of this conduct, Kamarás has caused Esmark Europe, BG Europe and BG to suffer monetary damages in excess of this Court's jurisdictional threshold.

215.    Kamarás' actions were willful, wanton, malicious and intentional and caused significant harm to Esmark Europe, BG Europe and BG, and warrant the imposition of punitive damages against Kamarás.

**COUNT VI**
**Tortious Interference with Prospective Contractual Relations**
**(Esmark Europe, BG Europe and BG v. Kamarás)**

216.    Esmark Europe, BG Europe and BG hereby incorporate by reference the allegations set forth in paragraph 1 through 215, above, as though fully set forth herein.

217.    Esmark Europe, and in turn BG Europe and BG, was the only credible and qualifying bidder for the Steel Company and, as a result, Esmark Europe's bid for the Steel Company was selected and set out the principal terms of Esmark Europe's privatization of the Steel Company.

218.    Consequently, Esmark Europe, and in turn BG Europe and BG, had a prospective contractual relationship with the Republic of Serbia to privatize the Steel Company.

219.    Kamarás knew of Esmark Europe's, and in turn BG Europe's and BG's, prospective contractual relationship with the Republic of Serbia.

220.    Kamarás knew that his conduct, which included: (a) making false statements about Esmark Europe's, and in turn BG Europe's and BG's, ability to finance the privatization; and (b) misrepresenting facts to question Esmark Europe's, and in turn BG Europe's and BG's, honesty, management skills, competence and capability to operate the Steel Company, would deter the Republic of Serbia from selecting Esmark Europe to privatize the Steel Company.

221.    Kamarás purposefully engaged in this conduct with the intent to prevent Esmark Europe, and in turn BG Europe and BG, from finalizing their privatization of the Steel Company.

222.    Upon information and belief, Kamarás intended to cause significant harm to Esmark Europe, and in turn BG Europe and BG, by depriving them of their prospective contractual benefits.

223.    Kamarás' conduct was not justified or privileged in any manner.

224.    Kamarás has caused significant economic harm to Esmark Europe, and in turn BG Europe and BG, as a result of the conduct alleged herein, and in excess of this Court's jurisdictional threshold.

225.    Upon information and belief, the Republic of Serbia would have finalized the sale of the Steel Company to Esmark Europe, and in turn BG Europe and BG, but for Kamarás' improper conduct.

226.    Kamarás' actions were willful, wanton, malicious and intentional and caused significant harm to Esmark Europe, BG Europe and BG, and warrant the imposition of punitive damages against Kamarás.

## COUNT VII
### Commercial Disparagement
### (Esmark Europe, BG Europe and BG v. Kamarás)

227.    Esmark Europe, BG Europe and BG hereby incorporate by reference the allegations set forth in paragraph 1 through 226, above, as though fully set forth herein.

228.    Upon information and belief, Kamarás made several false statements of fact, and incorrect statements of opinion about Esmark Europe, BG Europe and BG which include that Esmark Europe lacked the requisite financing to privatize the Steel Company and that Esmark Europe's investors, including BG Europe and BG, were engaged in self-dealing, incompetent and deceitful.

229.    Kamarás either knew these statements were false or acted in reckless disregard of the statements' truth or falsity.

230.    Kamarás communicated these false and incorrect statements to the Administration, the Privatization Working Group, the Privatization Commission and the Steel Company, with the intent that the statements would prevent Esmark Europe from privatizing the Steel Company and incur pecuniary loss or reasonably should have recognized that the statements would result in Esmark Europe incurring a pecuniary loss.

231.    At a minimum, Kamarás reasonably should recognize that his false and incorrect statements would prevent Esmark Europe from privatizing the Steel Company and case Esmark Europe, BG Europe and BG to incur pecuniary loss.

232.    Kamarás conduct in making these statements was not privileged in any manner.

233.    Upon information and belief, Kamarás' false statements of fact and incorrect statements of opinion were the basis for the Republic of Serbia's refusal to finalize the sale of the Steel Company to Esmark Europe.

234.     As a result of Kamarás' puerile campaign of commercial disparagement, Esmark Europe was unable to privatize the Steel Company and therefore have suffered a direct monetary loss disparaging statements, Esmark Europe, BG Europe and BG have suffered a direct monetary loss in excess of this Court's jurisdictional threshold.

235.     Kamarás' actions were willful, wanton, malicious and intentional and caused significant harm to Esmark Europe, BG Europe and BG and warrant the imposition of punitive damages against Kamarás.

**COUNT VIII**
**Defamation**
**(Esmark Europe, BG Europe and BG v. Kamarás)**

236.     Esmark Europe, BG Europe and BG hereby incorporate by reference the allegations set forth in paragraph 1 through 235, above, as though fully set forth herein.

237.     Upon information and belief, Kamarás made several false statements of fact, and incorrect statements of opinion about Esmark Europe, BG Europe and BG which include that Esmark Europe lacked the requisite financing to privatize the Steel Company and that Esmark Europe's investors, including BG Europe and BG, were engaged in self-dealing, incompetent and deceitful.

238.     When Kamarás made these statements, he knew that the statements were false and would likely foreclose Esmark Europe's opportunity to privatize the Steel Company.

239.     Kamarás made these statements without any privilege or justification.

240.     Upon information and belief, these defamatory statements harmed Esmark Europe's, BG Europe's and BG's reputation and deterred the Republic of Serbia from selecting Esmark Europe to privatize the Steel Company.

241.    Upon information and belief, Kamarás' defamatory statements formed the basis for the Republic of Serbia's refusal to select Esmark Europe to privatize the Steel Company.

242.    Kamarás' statements were defamatory per se because the statements ascribed to Esmark Europe's, BG Europe's and BG's conduct and character that adversely affect Esmark Europe's, BG Europe's and BG's fitness for the proper conduct of their lawful business, trade, or profession.

243.    As a result of Kamarás' conduct, Esmark Europe, BG Europe and BG have incurred monetary damages in excess of this Court's jurisdictional threshold.

244.    Kamarás' actions were willful, wanton, malicious and intentional and caused significant harm to Esmark Europe, BG Europe and BG and warrant the imposition of punitive damages against Kamarás.

**PRAYER FOR RELIEF**

WHEREFORE, Esmark Europe, BG Europe and BG demand judgment in their favor and against Kamarás as follows:

(i)     That the Court award BG compensatory and consequential damages as a result of Kamarás' breaches of the Term Sheet;

(ii)    That the Court award Esmark Europe compensatory, consequential and punitive damages as a result of Kamarás' breach of fiduciary duty;

(iii)   That the Court award Esmark Europe compensatory, consequential and punitive damages as a result of Kamarás' breach of duty of loyalty;

(iv)    That the Court award Esmark Europe, BG Europe, and BG compensatory, consequential and punitive damages as a result of Kamarás' unfair competition;

(v)      That the Court award Esmark Europe, BG Europe, and BG compensatory, consequential and punitive damages as a result of Kamarás' tortious interference with their prospective contractual relations;

(vi)     That the Court award Esmark Europe, BG Europe and BG compensatory, consequential and punitive damages as a result of Kamarás' commercial disparagement;

(vii)    That the Court award Esmark Europe, BG Europe and BG compensatory, consequential and punitive damages as a result of Kamarás' defamation;

(viii)   That the Court enter judgment against Kamarás for prejudgment interest; and

(ix)     Such other relief as this Court shall deem just and equitable under the circumstances.

Plaintiffs demand a trial by jury on all issues so triable

Dated: March 4, 2015                          Respectfully submitted,

                                              /s Brad A. Funari
                                              Brad A. Funari (Pa. ID No. 35155)
                                              Brian C. Root (Pa. ID No. 306454)
                                              McGuireWoods LLP
                                              625 Liberty Avenue, Suite 2300
                                              Pittsburgh, PA  15222
                                              Telephone:  (412) 667-6000
                                              Fax:  (412) 667-6050
                                              bfunari@mcguirewoods.com
                                              broot@mcguirewoods.com

                                              *Counsel for Plaintiffs*